David L. Kramer, OSB 802904
E-mail: David@KramerLaw.us
David L. Kramer, P.C.
3265 Liberty Road South
Salem, OR 97302
Tel. 503.364.1117
Fax. 503.391.4269
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **WENDY NELSON-BACA,** | Civil No. 3:18-cv-00300-YY |
| Plaintiff, | |
| vs. | **SECOND AMENDED COMPLAINT** (Alleging Employment Discrimination, Civil Rights Violations and State Tort Claims) |
| **THE STATE OF OREGON,** by and through the **DEPARTMENT OF HUMAN SERVICES; CLYDE SAIKI**, an individual; **REBECCA DANIELS,** an individual; **BROCK WALLACE,** an individual; and, **DON ERICKSON**, an individual. | **Jury Trial Requested** |
| Defendants. | |

For her First Amended Complaint, Plaintiff alleges as follows:

**FACTS COMMON TO ALL CLAIMS**

<u>A. PARTIES</u>

1.

Plaintiff, Wendy Nelson-Baca, resides in Yamhill County, Oregon. All transactions alleged herein occurred in Marion County, Oregon.

Page 1 - SECOND AMENDED COMPLAINT:  *Nelson-Baca v. State of Oregon et. al.,*
       Civil No. 3:18-cv-00300-YY

2.

The Department of Human Services (DHS) is an agency of the State of Oregon. At all material times Clyde Saiki was the Director of DHS, Rebecca Daniels was the Director of Human Resources for DHS, Brock Wallace was a Human Resource Investigator for DHS, and Don Erickson was a manager for DHS.  Each of the individually named Defendants acted in the course and scope of their employment with the State of Oregon and acted under color of State law.  Each individually named Defendant committed, conspired to commit, or aided and abetted in the commission of some or all of the wrongful and unlawful acts alleged herein.  Defendants' conduct, as alleged herein, was willful, malicious, and with the wrongful intent to retaliate against Plaintiff for engaging in the protected activity alleged herein.

3.

Plaintiff was a DHS employee for more than 31 years.  She was originally hired by DHS in 1986 as a clerical specialist. Over the course of her employment she was promoted through the ranks as a worker and, then, as a manager.  In 2001 she was promoted to be the Administrator of DHS' Forms and Document Management Unit which, in 2005, became DHS' Imaging and Records Management (IRMS) Unit. She remained as the IRMS Administrator until she was placed on involuntary paid administrative leave, duty stationed at home, in December, 2016, and, thereafter, was discharged from her employment in July of 2017.

B. IMAGING AND RECORDS MANAGEMENT OPERATIONS

4.

IRMS is part of DHS' Central and Shared Services function ("Shared Services"). Shared Services provides services to DHS and to the Oregon Health Authority (OHA).  The purpose of

Shared Services is to save taxpayer money by preventing duplication of services by DHS and OHA.

5.

IRMS processed large volumes of incoming Medicaid-related paperwork and data, including applications of Oregonians to qualify for Medicaid benefits and claims from medical service providers for payment of services to qualified Oregonians.

C. DHS KNOWINGLY WASTED MILLIONS OF TAXPAYER DOLLARS

6.

At all material times DHS and OHA had a duty to prevent fraud, waste, and abuse of state and federal funds spent in the Medicaid system as required by, among other statutes and rules: ORS 293.295; ORS 409.040(2); 42 CFR 441.301(c)(2)(xii); and ORS 162.405.  Moreover, at all material times the policy of Oregon's Governor was that state managers were to have "zero tolerance for the waste of taxpayer dollars," a policy most recently expressed by the Governor on November 7, 2017, when she removed the OHA Director and appointed a successor as a consequence of the wasteful practices alleged herein.

7.

Beginning on or about August, 2016, and continuing at all material times thereafter, DHS and OHA knew through its shared Eligibility and Enrollment Review Committee, among other sources of information, that their Medicaid-related claims and processing practices caused an enormous waste of state and federal Medicaid funds. The wasteful practices included, but were not limited to, the following:

a)  The failure to determine if persons were eligible for Medicaid services before paying for those services;

b)  The failure to reasonably deal with a backlog of eligibility determinations;

c)  The failure to conduct reasonable auditing and testing of computer systems used in the Medicaid business.  Those systems included the ONE computer system, which processed Medicaid applications and determined whether a person was eligible for Medicaid benefits, and the Medicaid Management Information System used for processing claims from medical providers seeking reimbursement for services to persons using Medicaid; and,

d)  Conducting a "pay and chase" process by which the State would "pay" for Medicaid benefits for persons it knew, or should have known, were not eligible for such benefits with the unreasonable expectation that the State would thereafter "chase" down the overpaid payees and the overpayments.

8.

Defendants, or some combination of them, including DHS and OHA's Shared Services personnel, senior agency managers, and the Directors and their executive staffs knew or suspected that the foregoing wasteful and wrongful practices were ongoing and that the practices caused the State to unnecessarily spend huge amounts of money in the Medicaid program.  In 2017, as a result of an Oregon Secretary of State audit process, the financial loss to the State was estimated to be as much as $88 million dollars as a result of benefits being improperly paid on behalf as many as 100,000 Oregonians who were not eligible for Medicaid payments. These officials also knew that substantial sanctions and penalties could be levied by the federal

government if it learned of these wasteful practices. This exposure included a federal order that Oregon repay the federal government for wasted Medicaid funds, as well as a federal order to revoke the State's Federal Medicaid Service Waiver – a waiver necessary for Oregon to run its self-direction Medicaid program.

9.

During 2016 and 2017, DHS and OHA executives, including the individually named Defendants, were concerned that the press, the Legislature, the Governor and/or the public might learn of the depth and scope of the unnecessary loss of taxpayer funds. They knew this would likely cause public scandal, would embarrass the Governor and the State's Executive Branch, would likely put the jobs of one or more senior persons in jeopardy, and could cause federal Medicaid authorities to impose the above-described sanctions for permitting unacceptable levels of fraud, waste and abuse to persist in Oregon's Medicaid program. Defendants were motivated to avoid this scrutiny and its ramifications.

10.

At all material times, despite State policy to the contrary, senior managers in the Shared Services function of DHS and OHA promoted a culture of hiding waste, impeding audits, whistleblowing, stalling reform, and assigning blame to "fall guys" for potentially embarrassing agency problems, including those alleged herein.  Acting on that culture, the Chief Audit Executive responsible for DHS and OHA internal Medicaid audits actively tried to impede the Secretary of State's audit process and intimidated line staff from openly cooperating with the Secretary of State's audit.  DHS and OHA line workers were prohibited from responding directly to auditor questions, they were directed to stall the process of answering auditor questions, and

they were told to provide incomplete or erroneous information to Secretary of State auditors.  All

of this misconduct was a means, as alleged herein, to hide the waste of Medicaid funds.

Defendants were motivated to either support that behavior, to implicitly condone it, or at least to

keep it hidden from scrutiny by the public or state auditors.

11.

During 2016 and 2017, DHS and the individually named Defendants were also motivated

to placate public employee unions as a means to avoid union unrest and political scrutiny.  Said

Defendants feared union unrest could exacerbate the political problems faced by the agencies,

including, but not limited to, the wrongful acts alleged herein.  As a result, these state executives

prioritized union demands over the reasonable stewardship of taxpayer dollars and retaliated

against managers, including Plaintiff, who disagreed with this practice.

12.

Because of these fears, and at all material times, Defendants, primarily through the efforts

of Defendant Rebecca Daniels, were motivated to: (a)  quash Plaintiff's ongoing efforts to point

out wasteful business practices with the Medicaid system;  (b) placate Union unrest; and (c) find

a "fall guy" to blame for the foregoing.

### D.  PLAINTIFF'S EFFORTS TO PREVENT MISMANAGEMENT AND WASTEFUL SPENDING

13.

During 2016, including the six months immediately preceding her removal from IRMS,

Plaintiff made one or more of the following forms of protected "whistleblowing" speech, all of

which concerned violations of state and federal Medicaid laws, rules or regulations, as set forth

above; mismanagement; gross misuse or waste of public resources or funds; or the abuse of

authority in connection with the administration of a public program or the execution of a public contract.  Her protected activity included the following:

a)  Plaintiff complained to Defendants Saiki and Daniels, among others, that it was wrong and wasteful to:

1)  Put union interests above taxpayer interests just for the sake of keeping "peace" with the union;

2)  Allow IRMS morning shift workers to be idle for one or two hours each morning while the workers waited for incoming Medicaid documents to be delivered for processing;

3)  Falsely refer to the idle workers as being engaged in "5S'ing" (a reference to a workplace improvement process that Human Resources knew did not exist);

4)  Buy new or additional office furniture and equipment for approximately eighty (80) IRMS employees, despite management anticipating a significant reduction in staff which would negate the need for such an expenditure;

5)  Allow excessive modification to shift worker hours knowing this would decrease IRMS efficiency and increase IRMS production costs;

6)  Hire temporary workers to process the Medicaid application backlogs while at the same time allowing the above-described practices;

7)  Allow intentional work slowdowns by IRMS workers and then grant overtime pay to those workers at the end of their shifts to keep up with processing backlogs caused by the slowdowns;

8)  Allow IRMS line workers to "work 76 hours and get paid for 80 hours";

9)  Allow IRMS data entry operators to manipulate the personnel system so as to obtain "instant 5% raises," by giving them a technician position (which carried a 5% pay raise) despite knowing that such operators would thereafter demote back to their former positions while retaining the pay raise;

10)  Bring disabled "Employment First" workers into IRMS workplace as data entry operators without making accommodations for the production expectations for those workers and without making appropriate budget accommodations; and,

11)  Reduce IRMS staffing levels from approximately 130 to 76 employees despite knowing: (a) this would result in a significant backlog in processing client applications used to determine Medicaid eligibility; (b) it would aggravate the "pay and chase" problems; (c) it would lead to unreasonable and avoidable costs, including, but not limited to, overtime costs necessary to reduce claims processing backlogs.

b)  Plaintiff also complained to Defendants that it was wrong and wasteful to:

1)  Accept inadequate work from computer contractors who were paid for services which were not satisfactory or not provided at all;

2)  Use a computer contractor with a history of providing deficient or defective software systems to DHS;

3)  Use a "time and materials" contract for computer services rather than a performance-based contract;

4)  Appoint a DHS liaison for purposes of administering the computer services contract, which liaison was ill-suited for the job due to lack of training and experience and because of his unduly close relationship with the contractor;

5)  Process Medicaid applications too slowly as a result of the foregoing issues, causing Medicaid applications to stack up in the system as alleged above;

6)  Require Medicaid applicants to physically reapply for benefits as a means to overcome computer system shortcomings knowing that would create a large volume of redundant applications -- sometimes as many as five (5) applications from a single Medicaid client – which increased processing time and led to overpayments of Medicaid benefits as described above; and,

7)  Conduct a "pay and chase" business model for Medicaid to recover overpayments.

14.

Defendants rejected most or all of Plaintiff's warnings. The common theme from Plaintiff's managers was that Plaintiff should tow the company line, stop reporting/complaining, remain quiet, and then Plaintiff would be fine.  With respect to her objections about the computer contracting process, Plaintiff was advised to the effect that the contractor, "would fail again and DHS will fix it again after the contract ends."  Plaintiff was told to deliver a message to her deputy administrator to this effect: "tell him to be quiet and not be a road-block, they are looking for a scape goat and he doesn't want it to be him."  With respect to the Medicaid overpayments and "pay and chase" problems, Plaintiff was told that was not her job or concern and her role was to process all incoming applications regardless of potential eligibility status.   It was enough,

managers said, that the State might recoup some of the losses in the "pay and chase" program. With respect to the labor/management inefficiencies, Plaintiff was instructed to keep the union leadership and union members happy despite their slow-downs and unreasonable demands.

<u>E. DHS RETALIATES AGAINST PLAINTIFF IN CONCERT WITH THE UNION</u>

15.

The Service Employees International Union Local 503 (SEIU) represented IRMS line workers.  Michael Coutley (Coutley) was an SEIU employee and a union organizer.

16.

Starting in August of 2016 and continuing at all material times thereafter, Coutley and SEIU conducted a clandestine "bully boss campaign" against Plaintiff, with the express purpose of getting DHS Human Resources to fire Plaintiff.

17.

As part of the "bully boss campaign," Coutley had IRMS workers sign a petition that made false and defamatory statements against Plaintiff.  Coutley also solicited anecdotes about Plaintiff from IRMS union activists.  He knew the anecdotes he received were largely based on second-hand, old, vague, false, or partially true information – to the point many of the anecdotes were false, misleading or otherwise unreliable.

18.

In November of 2016 Coutley convened a special meeting between himself, Rebecca Daniels, and IRMS union workers. He presented the petitions and the anecdotal information about Plaintiff to Daniels in furtherance of the bully boss Campaign. DHS immediately started a personnel investigation of Plaintiff and her subordinate managers.

19.

At all material times DHS, Daniels, and Wallace knew or should have known of the existence of the bully boss campaign, that it was being conducted in bad faith, and that information provided in the course of the campaign was inherently biased and suspect.

20.

Defendants, or some combination of them, acted in concert with SEIU and Coutley during the course of the bully boss campaign. SEIU and Coutley were motivated to increase their perceived power in the workplace. This power was derived from showing SEIU members the union could cause managers to be fired, that it could remove Plaintiff and her practice of fiscal conservatism as a barrier to its bargaining process, that it could improve recruitment of union members, and it could intimidate remaining managers and Human Resources personnel so they would placate the union further. Defendants were motivated to retaliate against Plaintiff for having made protected speech and to prevent her from engaging in such speech in the future.

21.

On or about December 9, 2016, without prior notice and before Plaintiff was aware of the pending investigation or the bully boss campaign, Defendant Daniels put Plaintiff on paid administrative leave and on "duty stationed at home" status. Plaintiff was physically barred from DHS offices including her own office. While Plaintiff was "duty stationed at home," she was ordered to physically stay in her home for over seven (7) months, Monday through Friday from 8:00 a.m. to 5:00 p.m. each workday. DHS threatened to fire Plaintiff if she did not follow this order. DHS did not assign work to Plaintiff and never had the intent to assign her work from home. There was no arguable business reason for confining her to her home. By so ordering

Page 11 - SECOND AMENDED COMPLAINT:  *Nelson-Baca v. State of Oregon et. al.,*
         Civil No. 3:18-cv-00300-YY

Plaintiff, Defendants effectively and repeatedly put Plaintiff into "house arrest" during what otherwise would have been DHS workdays.  The series of confinements continued from December 9, 2016, through the date of her termination on July 17, 2017.

22.

In December of 2016, during the course of the bully boss campaign, DHS Human Resources personnel leaked information to Michael Coutley confirming it intended to remove Plaintiff or cause her to resign from DHS, despite the fact that the Human Resources investigation of Plaintiff and her two subordinate managers had just commenced.  DHS told Coutley, "Tony [subordinate manager] will never work for the State of Oregon again. Wanda [subordinate manager] can remain in State service, if she can find a job outside of IRMS, and HR is waiting for Wendy to resign while she's under investigation, which should happen any day now."

23.

Plaintiff kept approximately 14 hard and soft covered spiral notebooks on a shelf in her DHS office.  The notebooks remained there through the time she was barred from her office. Those notebooks contained her handwritten notes about meetings, people in attendance at those meetings, and other work-related topics and circumstances. This information included evidence supporting her whistleblowing allegations, Defendants' knowledge thereof, and information that would refresh Plaintiff's memory about the events alleged herein.  At all material times DHS had sole custody and control of those notebooks.

////

////

Page 12 - SECOND AMENDED COMPLAINT:  *Nelson-Baca v. State of Oregon et. al.,*
        Civil No. 3:18-cv-00300-YY

24.

In January 2017, Plaintiff's counsel requested that DHS and Daniels implement a

"litigation hold" to preserve Plaintiff's work notebooks and all other information relevant to

Plaintiff's claims.  DHS did not implement a litigation hold, did not secure the notebooks and

other information, and never provided Plaintiff with the notebooks and other documents that

DHS knew or should have known were relevant to Plaintiff's claims and defenses.  DHS

withheld or destroyed the notebooks to prevent Plaintiff from having them for use in defending

herself in the DHS investigation, the DHS pre-termination process, and this litigation.

25.

On June 19, 2017, DHS Human Resources provided Plaintiff with written notice that a

pre-disciplinary process had been started that could result in discipline up to and including

Plaintiff's "removal as a Principle/Executive Manager F (PEM F) with an effective end of her

state service."  As required by state personnel policy, the notice listed the allegations against

Plaintiff and provided her with various procedural rights to dispute the proposed removal from

state service. The notice said, among other things:

> "A meeting has been scheduled to give you opportunity to refute the facts
> or present mitigating information before a final decision is made. You
> have the right to have a management service coworker or an attorney
> present at this meeting. This meeting will be held on Wednesday June 28,
> 2017 at 9:00 AM in the Human Services Building, room 452, located at
> 500 Summer Street, Salem, Oregon 97301. You may participate in the
> meeting by conference call. If you chose this option, you inform the Office
> of Human Resources and provide the phone number by Tuesday June 27,
> 2017. You also have the option of providing a written response. This
> information must be received in my office by 5:00 PM on Wednesday
> June 28, 2017.  If you choose not to attend or submit a response, the
> Department will not use this decision as an admission or denial of the facts
> presented in this notice, but will base its decision on the information
> available."

26.

On June 30, 2017, pursuant to Plaintiff's request for information to use in her written

response, DHS' attorney provided Plaintiff with some of the documents related to the DHS

investigation and reaffirmed that Plaintiff could make a written presentation to the Director

before he decided whether to discipline her.

27.

On or about July 13, 2017, DHS, through counsel, advised Plaintiff as follows:

> "This is to confirm what I told you during our phone conversation
> yesterday morning - that Wendy Nelson-Baca is classified as an
> executive service employee. Please see the attached document she
> received back in 2008.  DHS is rescinding the pre-disciplinary letter
> issued to Ms. Nelson-Baca on June 19, 2017, in which the agency
> mistakenly referred to her as being in the management service
> classification.
>
> DHS plans on taking personnel action on Monday with regard to
> Ms. Nelson-Baca.  However, the agency would like Ms. Nelson-Baca to
> have the opportunity to provide any additional information she thinks is
> relevant to her situation before that decision is made. Please submit
> anything you would like the agency to consider by 5 p.m. tomorrow,
> Friday, June 14."

The referenced letter purporting to transfer Plaintiff to the executive service is dated

February 11, 2008 and is attached hereto as Exhibit "A."  At all material times DHS knew, or

should have known, that letter was inherently unreliable and could not be the basis of depriving

Plaintiff of her due process rights in the pre-termination process. DHS knew it did not provide

the February 11, 2008, letter to Plaintiff in 2008 and did not then advise her of rights she may

have to contest the proposed transfer to executive service.  The letter was not included in

Plaintiff's personnel file or in any of the files where it should have been regularly maintained.

No one can authenticate the letter, testify that it is a true copy of an original document, or

establish that such a letter was sent to Plaintiff.  Furthermore, the letter is null and void on its

face, because DHS knew it did not comply with the authority cited in the [form] letter:  HB 2184

and ORS 240.205(4), since Plaintiff's position was not defined as one eligible for involuntary

assignment to executive service and because DHS did not obtain the requisite approval of the

Department of Administrative Services to transfer Plaintiff into executive service.

28.

One July 14, 2017, Plaintiff emailed to the Director a timely, extensive written

presentation for Director Clyde Saiki to consider in making his decision whether to discipline

Plaintiff.  The presentation is attached and incorporated as Exhibit "B."

29.

Defendant Rebecca Daniels willfully withheld Plaintiff's written presentation from

Director Saiki. She did not tell Director Saiki that the written presentation had been submitted,

nor did she advise him of its contents or his options under the state's progressive discipline

policy in light of the written submission.  Daniels knew there was no good business reason for

withholding this information from the Director, knew that the Director had in the past had a very

successful work relationship with Plaintiff, and knew that the new information might influence

the Director to reject Daniels' recommendation and not fire Plaintiff.

30.

On July 17, 2017 Defendant Saiki terminated Plaintiff's DHS employment without cause,

without affording her any of the due process rights set forth in her pre-disciplinary letter, without

consideration of her written presentation, and without considering or providing any form of

progressive discipline. He did this solely as a result of Daniels' recommendation.

31.

Plaintiff has been underemployed since leaving DHS and now works as an office

manager in a dental clinic.  Plaintiff is unable to obtain comparable employment to that as a

senior DHS executive because of the circumstances surrounding her termination from DHS and

because she does not have a college degree – all of which was known to Defendants. As a result

of Defendants' unlawful conduct, Plaintiff has  incurred economic damage in the form of lost

back pay and benefits from the time of her termination through the time of trial and, additionally,

in the form of lost front pay and benefits through the time she otherwise would have retired at

age 65 at or above the pay rate she made at DHS, less pay she received and will receive from

working at a dental clinic.  The amount of this loss will be determined at trial and is believed to

be not less than $1.25 million dollars.

32.

As a result of Defendants' unlawful conduct, Plaintiff has incurred non-economic damage

in the form of loss of self-esteem, depression, anxiety, emotional distress, loss of sleep, and

diminished enjoyment of life, all in an amount to be determined at trial and believed to be not

less than $1.75 million dollars.

33.

Plaintiff is entitled to recover her attorney's fees incurred in this matter, as provided by

ORS 659A.885 and 42 USC §1988.

34.

Plaintiff provided the State of Oregon, Department of Administrative Services, with

adequate and timely written notice of her state law tort claims, as required by ORS 30.275.

35.

Plaintiff exhausted her administrative remedies with respect to the claims alleged herein.

She filed a Complaint with the Oregon Bureau of Labor and Industries, which issued a right to

sue letter on or about November 21, 2017.

**FIRST CLAIM FOR RELIEF**
(42 U.S.C. §1983 Claim for Violation of Free Speech against Defendant Daniels.
"Cat's Paw" Liability)

36.

Plaintiff re-alleges the allegations set forth above.

37.

Plaintiff's protected activity, as alleged above, was an exercise of her right to free speech

as guaranteed by the First and Fourteenth Amendments to the United States Constitution. The

wrongful and retaliatory acts alleged above violated Plaintiff's constitutional right to free speech.

38.

DHS Director Clyde Saiki was the decision maker who fired Plaintiff.  Daniels was a

biased subordinate who lacked decision-making authority and used Saiki as a dupe in a scheme

to trigger a discriminatory employment action against Plaintiff.

39.

Defendant Rebecca Daniels acted to intentionally violate Plaintiff's First Amendment

rights. Alternatively, Defendant Daniels acted with deliberate indifference to Plaintiff's

constitutional rights.

40.

Defendant Daniels' wrongful acts caused the damage alleged above.

41.

Plaintiff is entitled to recover her damages and attorney's fees pursuant to 42 U.S.C.

§1981 and §1988 and to appropriate injunctive relief including reinstatement at her former

position.

## SECOND CLAIM FOR RELIEF
(42 U.S.C. §1983 Claim for Violation of Free Speech
against Defendants Saiki, Daniels, and Wallace

42.

Plaintiff realleges the allegations set forth above.

43.

Plaintiff's protected activity, as alleged above, was an exercise of her right to free speech

as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

Defendants' wrongful and retaliatory acts alleged above violated Plaintiff's constitutional right

to free speech.

44.

Defendants Clyde Saiki, Rebecca Daniels, and Brock Wallace acted with the intent to

deprive Plaintiff of her First Amendment rights.  Alternatively, Defendants acted with deliberate

indifference to Plaintiff's constitutional rights.

45.

Defendants wrongful acts caused the damage alleged above.

/////

/////

/////

46.

Plaintiff is entitled to recover her damages and attorney's fees pursuant to 42 U.S.C. §1981 and §1988 and to appropriate injunctive relief including reinstatement at her former position.

### THIRD CLAIM FOR RELIEF
(42 U.S.C. §1983 Due Process Claim Against Defendants Saiki, Daniels, and Wallace)

47.

Plaintiff re-alleges the allegations set forth above.

48.

Plaintiff had a property and liberty interest protected by the Fifth and Fourteenth Amendments to the United States Constitution to keep her job unless she was afforded the procedural due process rights set forth in paragraph 25 above, including the opportunity to make a personal and written presentation in her defense to Director Saiki.

49.

Defendants Clyde Saiki, Rebecca Daniels, and Brock Wallace violated Plaintiff's Fifth and Fourteenth Amendment rights by not providing the process alleged above before deciding whether Plaintiff should be terminated.

50.

Defendants acted with the intent to deprive Plaintiff of her rights to due process. Alternatively, Defendants acted with deliberate indifference to Plaintiff's constitutional rights.

51.

The constitutional violation caused the damage alleged above.

52.

Plaintiff is entitled to recover her damages and attorney's fees pursuant to 42 U.S.C. §1981 and §1988 and to appropriate injunctive relief including reinstatement at her former position.

**FOURTH CLAIM FOR RELIEF**
(42 U.S.C. §1983 Claim for Violation of Plaintiff's Fourth Amendment Right to be Free from Unreasonable Seizure against Defendants Saiki and Daniels)

53.

Plaintiff re-alleges the allegations set forth above.

54.

Plaintiff had a right to be free from unreasonable seizure of her person by the government as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

55.

Defendants Saiki, Daniels and Wallace violated Plaintiff's Fourth Amendment Rights each day they effectively placed Plaintiff in "house arrest" during the pendency of her being "duty stationed at home," all as alleged above. Requiring Plaintiff to be physically confined at her home was not reasonable under the circumstances and was not otherwise authorized by law.

56.

Defendants acted with the intent to deprive Plaintiff of her Fourth Amendment rights. Alternatively, Defendants acted with deliberate indifference to Plaintiff's constitutional rights.

57.

The constitutional violation caused the damage alleged above.

58.

Plaintiff is entitled to recover her damages and attorney's fees pursuant to 42 U.S.C.

§1981 and §1988 and to appropriate injunctive relief including reinstatement at her former

position.

## FIFTH CLAIM FOR RELIEF
### (False Imprisonment Claim Against DHS)

59

Plaintiff realleges the facts set forth above.

61.

Each day Plaintiff was ordered to be physically confined to her home, as alleged above,

DHS unreasonably restrained Plaintiff's freedom of movement.

61.

DHS acted without lawful authority, without probable cause, and without any objectively

reasonable basis to restrict Plaintiff's freedom of movement.  DHS acted willfully and

intentionally and with the intent to punish Plaintiff for her actions, as alleged above, and to

prevent her from making further disclosures of wasteful DHS actions.

62.

By wrongfully confining Plaintiff, DHS caused the damage alleged above.

## SIXTH CLAIM FOR RELIEF
### (Negligent Investigation Claim Against the State of Oregon)

63.

Plaintiff realleges the facts set forth above.

64.

Plaintiff was in a special employer-employee relationship with the Department of Human Services.

65.

DHS conducted a negligent personnel investigation and termination process relating to Plaintiff. The negligence included one or more of the following acts and omissions:

a) It failed to secure or preserve important DHS records, including, but not limited to, Plaintiff's notebooks;

b) It failed to implement a reasonable or timely litigation hold notice to DHS employees;

c) It failed to investigate the "bully boss campaign" and the potential witness bias issues presented thereby;

d) It failed to determine whether Plaintiff's alleged transfer to Executive Service in fact happened, whether the proposed transfer complied with the authority cited in the letter, whether DAS approved of the proposed transfer as required by statute, or whether Plaintiff received appropriate notice of the alleged transfer. Similarly, DHS Human Resources failed to determine whether the letter could be authenticated, whether it was regularly maintained in the appropriate files of DHS or DAS, or whether any DAS or DHS witness had actual knowledge that the alleged transfer had lawfully taken place.

e) It failed to reasonably comply with the Director's order that Human Resources interview Jeremy Emerson, who was then recently retired and was the longest-serving supervisor of Plaintiff during the times material to the investigation. DHS Human

Resources failed to ask Mr. Emerson the most basic questions about Plaintiff's performance, her work product, her work ethic, her compliance with her telecommuting agreement, or her potential for responding to coaching or other progressive discipline.  It also failed to ask him for his recommendations to the Director;

f) It failed to provide the Director with a reasonably objective, accurate, complete, and detailed account of transactions that gave rise to Human Resource's allegations against Plaintiff and to provide any information about Plaintiff's potential for responding to coaching or other progressive discipline;

g) It failed to ask reasonably thorough questions during witness interviews as a means to assess transactions reported by witnesses to determine the overall credibility of witnesses, to include questions about:

    1) Whether the witness had bias, including bias related to the "bully boss campaign;"

    2) Whether the allegations in the SEIU petition and the anecdotal information provided to Defendant Daniels were supported or refuted by witness observations, as opposed to rumor or otherwise;

    3) Whether the witness had any personal knowledge about reported transactions;

    4) Whether the witness had specific details about reported transactions, including the "who, what, when, and where" information necessary to determine whether the witness had first-hand knowledge of transactions at

issue, had the ability to perceive the transactions, and whether the transactions were reasonably proximate in time for purposes of the investigation;

5)   Whether reported problems regarding Plaintiff were the subject of prior complaints or grievances and, if so, the details and results therefrom; and,

6)   In the case of interviews of management witnesses, whether such witnesses had opinions as to Plaintiff's truthfulness, reputation for truthfulness, and potential for improving perceived performance issues given reasonable coaching or progressive discipline.

66.

DHS' negligence caused the Director to have unreasonably misleading and incomplete information to make his decision about Plaintiff. The negligence caused the damage alleged above. That damage was reasonably foreseeable as a consequence of DHS' negligence.

**SEVENTH CLAIM FOR RELIEF**
(Intentional Infliction of Extreme Emotional Distress Against the State of Oregon)

67.

Plaintiff realleges the allegations set forth above.

68.

By engaging in the wrongful actions alleged above, DHS intended to inflict severe emotional distress on the Plaintiff.  DHS' conduct caused Plaintiff to suffer severe emotional distress and was an extraordinary transgression of the bounds of socially tolerable behavior.

69.

Defendant caused the damage alleged above.

Page 24 - SECOND AMENDED COMPLAINT:  *Nelson-Baca v. State of Oregon et. al.,*
         Civil No. 3:18-cv-00300-YY

## EIGHTH CLAIM FOR RELIEF
(ORS 659A.203 Whistleblowing Retaliation Against a Public Employee.
Against the State of Oregon, Only)

70.

Plaintiff realleges the allegations set forth above.

71.

The protected disclosures made by Plaintiff, as alleged above, were of information that Plaintiff reasonably believed was evidence that DHS had violated federal Medicaid laws and state laws and policies, as set forth above. It was also evidence that DHS had engaged in mismanagement, gross waste of funds, or abuse of authority.

72.

DHS put Plaintiff in house arrest at her home, threatened and eventually took disciplinary action against her, and terminated her employment, all because of Plaintiff's disclosures, in violation of ORS 659A.203(1) and (2).

73.

DHS' acts caused the damage alleged above.

74.

Pursuant to ORS 659A.885(1) and (3), Plaintiff is entitled to the following remedies:

a) Back pay;

b) Compensatory damages or $200.00, whichever is greater;

c) Appropriate injunctive relief including but not limited to reinstatement to her job; and,

d) Attorney's fees and costs incurred in bringing this action.

## NINTH CLAIM FOR RELIEF
(ORS 659A.199 et. seq. Whistleblowing Retaliation Claim Against a Public or Private Employee. Against the State of Oregon, Only)

75.

Plaintiff re-alleges the allegations set forth above.

75.

DHS put Plaintiff in house arrest at her home, threatened and eventually took disciplinary action against her, and terminated her employment, all because she made the good-faith disclosures alleged above, which she believed to be evidence of a violation of the state and federal laws, rules and regulations previously alleged. In so doing, DHS violated ORS 659A.199.

76.

The State's unlawful conduct was a cause of the damage alleged above.

77.

Pursuant to ORS 659A.885(1) and (3), Plaintiff is entitled to the following remedies:

a)  Back pay;

b)  Compensatory damages or $200.00, whichever is greater;

c)  Appropriate injunctive relief including but not limited to reinstatement to her job; and,

d)  Attorney's fees and costs incurred in bringing this action.

**WHEREFORE** Plaintiff requests that a Judgment be entered in her favor, and against each Defendant, that awards her the following relief:

a)  Compensatory damages or $200.00, whichever is greater, to include:

/////

1) Plaintiff's economic damages in an amount to be proven at trial of not less

than $1.25 million dollars;

2) Plaintiff's non-economic damages in an amount to be proven at trial of not

less than $1.75 million dollars;

b) Appropriate injunctive relief including but not limited to reinstatement to her job;

and,

c) Such other equitable relief as the Court may deem appropriate, including

reinstatement to her former job at DHS.

DATED this 31st day of January, 2020.

DAVID L. KRAMER, P.C.

*s/ David L. Kramer*
David L. Kramer, OSB #802904
Attorney for Plaintiff
E-mail: David@KramerLaw.us
3265 Liberty Road South
Salem, OR  97302
Telephone: 503.364.1117
FAX No:   503.391.4269

Page 27 - SECOND AMENDED COMPLAINT:  *Nelson-Baca v. State of Oregon et. al.,*
Civil No. 3:18-cv-00300-YY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served the foregoing PLAINTIFF'S SECOND AMENDED

COMPLAINT on:

> Jill Schneider, Sr. Assistant Attorney General
> Department of Justice
> 100 SW Market St.
> Portland, OR  97201
> Email:  jill.schneider@doj.state.or.us
>
> Of Attorneys for Defendant

by e-mail to said counsel on the 31st day of January, 2020, and also by mailing certified true copies

of the above-referenced documents to said counsel at the address listed above in a sealed envelope

with postage prepaid and deposited in the U.S. mail in Salem, Oregon, on the 31st day of January,

2020.

DATED this 31st day of January, 2020

DAVID L. KRAMER, P.C.


By:  _s/ David L. Kramer_____
David L. Kramer, OSB No. 802904
Attorney for Plaintiff
*David@KramerLaw.us*
Telephone:  (503) 364-1117